707 So.2d 59 (1997)
Thelma PEAK
v.
TUSCALOOSA COMMERCE BANK.
No. 96 CA 1258.
Court of Appeal of Louisiana, First Circuit.
December 29, 1997.
*60 Anthony Russo, Jr., Seale, Smith, Zuber & Barnette, Baton Rouge, for Plaintiff-Appellant Thelma Peak.
Robert Harrison, Jr., Denham Springs, for Defendant-Appellee Tuscaloosa Commerce Bank.
Before CARTER, LeBLANC, GONZALES and PARRO, JJ., and TYSON,[1] J. Pro Tem.
CARTER, Judge.
This appeal is from a summary judgment in favor of Tuscaloosa Commerce Bank ("the Bank"), dismissing the claim of Thelma Peak ("Ms. Peak"), that the Bank should reimburse her for paying over $17,000 of forged checks drawn against her checking account. We affirm.

FACTS AND PROCEDURAL HISTORY
Between February 1994, and September 1994, Ms. Peak's grandson, Bryan Peak ("Bryan"), forged her signature on checks totaling $17,608.58 from her checking account at the Bank. Bryan accomplished these forgeries while living with his grandmother while he looked for a job. Ms. Peak permitted Bryan to pick up her mail, which allowed him to intercept her bank statements. Bryan would then remove all the cancelled checks he had forged and alter the bank statements to show only the items Ms. Peak had written. Bryan would also alter the balance so the statement did not reflect his forged checks. The altered statement was then placed back in the envelope, resealed, and given to Ms. Peak with the rest of her mail.
Before her grandson began writing checks on her account, Ms. Peak's balance stayed close to $20,000. She made a deposit every month, and generally wrote only five or six checks each month for utilities and church donations. These checks usually totaled less than $100 each month. When Bryan began forging checks, Ms. Peak's account activity increased substantially, because there were many more checks for significantly higher amounts written each month. All of the checks Bryan wrote were for more than $100, the highest being $1,250, and many of the checks were payable to him.
Ms. Peak was unaware there was a problem with her account until September 20, 1994, when a Bank representative telephoned her to advise her account was overdrawn. Sometime after this call, Ms. Peak contacted the Bank and indicated that various forged items had been presented and paid on her account over a period of time from February 1994, through September 1994. This was the first notice Ms. Peak reported to the Bank that forged items had been paid from her account.
Ms. Peak requested reimbursement from the Bank; however, the Bank refused on the basis Ms. Peak had not notified the Bank of the forgeries within the time period required by the Bank's deposit agreement. On August 31, 1995, Ms. Peak filed suit against the Bank, claiming it should reimburse her because the Bank was negligent and had breached its fiduciary duty to her by honoring and paying the forged instruments drawn on her account. The Bank answered the suit, denying liability on the basis it had fulfilled its statutory duty to her by mailing accurate monthly statements to Ms. Peak each month. The Bank argued Ms. Peak did not examine the statements carefully and notify it of the forgeries within the required time period; therefore, the Bank was not required to reimburse her.
The Bank filed a motion for summary judgment, supported by the affidavit of William Higdon, Jr., the Vice President and Cashier of the Bank, a copy of the signature card on Ms. Peak's account, and a copy of its "General Disclosures Deposit Accounts" ("deposit agreement"). Ms. Peak opposed the *61 motion for summary judgment, and filed excerpts from her deposition, along with copies of forged checks which had been paid by the Bank.[2] The trial court granted the motion for summary judgment, stating in written reasons:
The Court has reviewed the entire file, particularly the disposition (sic) of Plaintiff, Thelma F. Peak, in which she admitted that she made only a very limited examination of her monthly bank statement.
Mrs. Peak also admitted that she allowed her grandson to get the mail and that she trusted him.
The evidence clearly indicates that an examination of the bank statements would have revealed the alterations made by Brian (sic) Peak.
There is no indication that the bank did or failed to do anything that caused or contributed to Mrs. Peak's loss.
The Court feels that it is significant that almost all of the checks were made payable to Brian (sic) Peak, grandson of Plaintiff.
Finding there was no genuine issue of material fact between the parties, the court granted the motion for summary judgment and dismissed Ms. Peak's suit.
Ms. Peak urges in this appeal that the deposit agreement cannot abrogate or limit the Bank's duty of reasonable care and its fiduciary duty to her, and that the court failed to determine whether an allocation of the loss would be appropriate under LSA-R.S. 10:3-406 and LSA-R.S. 10:4-406. She argues that the issues of whether the Bank breached those duties, and whether the loss should be allocated according to the extent to which each party's failure to exercise ordinary care contributed to the loss, require a factual inquiry beyond what was or could be considered by the court in the motion for summary judgment.

APPLICABLE LAW

Review of Summary Judgment
Appellate courts review summary judgments de novo under the same criteria that govern the district court's consideration of whether summary judgment is appropriate. Schroeder v. Board of Supervisors of Louisiana State University, 591 So.2d 342, 345 (La.1991); Jackson v. Slidell Nissan, 96-1017, p. 9 (La.App. 1st Cir. 5/9/97); 693 So.2d 1257, 1263. A motion for summary judgment is properly granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact, and that the mover is entitled to judgment as a matter of law. LSA-C.C.P. art. 966(B); McKey v. General Motors Corporation, 96-0755, p. 3 (La.App. 1st Cir. 2/14/97); 691 So.2d 164, 167. Summary judgment is warranted only when reasonable minds must inevitably conclude that the mover is entitled to judgment as a matter of law. Gautreau v. Washington, 95-1731, p. 3 (La. App. 1st Cir. 4/4/96); 672 So.2d 262, 265, writ denied, 96-1164 (La. 6/28/96), 675 So.2d 1123.
When the forgeries forming the basis of this litigation occurred, Louisiana law discouraged summary judgments. See Robertson v. Our Lady of the Lake Regional Medical Center., 574 So.2d 381, 385 (La.App. 1st Cir.1990), writ denied, 573 So.2d 1136 (La. 1991). However, in 1996, the Louisiana legislature amended LSA-C.C.P. art. 966 by adding paragraph (A)(2), which states, in pertinent part:
The summary judgment procedure is designed to secure the just, speedy, and inexpensive determination of every action.... The procedure is favored and shall be construed to accomplish these ends.
Because the amended version is a procedural change, it is applied retroactively. Nail v. *62 Germania Plantation, Inc., 96-1602, p. 5 (La.App. 1st Cir. 5/9/97); 693 So.2d 1294, 1297. The effect of this amendment is to level the playing field between the parties in two ways: first, the supporting evidence submitted by the parties should be scrutinized equally, and second, the overriding presumption in favor of trial on the merits is removed. Jenson v. First Guaranty Bank, 96-0381, 96-0382, p. 7 (La.App. 1st Cir. 5/9/97); 699 So.2d 403, 405.
LSA-C.C.P. art. 966 was again amended by 1997 La. Acts No. 483, § 1 and 3, resulting in the repeal of sections (F) and (G) and the amendment of sections (C) and (E) to read as follows:
C. (1) After adequate discovery or after a case is set for trial, a motion which shows that there is no genuine issue as to material fact and that the mover is entitled to judgment as a matter of law shall be granted.
(2) The burden of proof remains with the movant. However, if the movant will not bear the burden of proof at trial on the matter that is before the court on the motion for summary judgment, the movant's burden on the motion does not require him to negate all essential elements of the adverse party's claim, action, or defense, but rather to point out to the court that there is an absence of factual support for one or more elements essential to the adverse party's claim, action, or defense. Thereafter, if the adverse party fails to produce factual support sufficient to establish that he will be able to satisfy his evidentiary burden of proof at trial, there is no genuine issue of material fact.
* * * * * *
E. A summary judgment may be rendered dispositive of a particular issue, theory of recovery, cause of action, or defense, in favor of one or more parties, even though the granting of the summary judgment does not dispose of the entire case.[3]
The legislative intent for retroactive application of this amendment to LSA-C.C.P. art. 966 is ascertained from Section 4, which states, "The purpose of Sections 1 and 3 of this Act is to clarify Acts 1996, No. 9, § 1 of the First Extraordinary Session of 1996 and to legislatively overrule all cases inconsistent with Hayes v. Autin, 96-287 (La.App. 3rd Cir. 12/26/96), 685 So.2d 691." 1997 La. Acts No. 483, § 4. The amendment to LSA-C.C.P. art. 966 seeks to rectify the misapplication of the article by various state courts by clarifying what the original amendment purported to enact. See Reichert v. State, Department of Transportation, 96-1419 c/w 96-1460, p. 7 (La. 5/20/97); 694 So.2d 193, 199. Interpretive laws merely establish the meaning the statute had from the time of its enactment, and, thus, are retroactive. See Keith v. U.S. Fidelity & Guaranty Company, 96-2075, p. 6 (La. 5/9/97); 694 So.2d 180, 183. Furthermore, the retroactive application of 1997 La.Acts. No. 483, § 1 and 3 does not impair contractual obligations or disturb vested rights. Therefore, in our determination of whether the trial court properly granted the motion for summary judgment, we will apply LSA-C.C.P. art. 966, as amended in 1996 and 1997. Morgan v. The *63 Earnest Corporation, 97 0869, p. 7 (La.App. 1st Cir. 11/7/97); 704 So.2d 272, 276-77.

Forged Checks
The general rule is that when a depositary of money, which is to be drawn upon by checks, pays on a forged check, it is liable for the amount of the checks, plus legal interest from the date of judicial demand. Stepter v. Hibernia National Bank, 524 So.2d 210, 211 (La.App. 4th Cir.1988). One of the exceptions to the general rule is found in LSA-R.S. 10:3-406, which states:
(a) A person whose failure to exercise ordinary care substantially contributes to an alteration of an instrument or to the making of a forged signature on an instrument is precluded from asserting the alteration or the forgery against a person who, in good faith, pays the instrument or takes it for value or for collection.
(b) Under Subsection (a), if the person asserting the preclusion fails to exercise ordinary care in paying or taking the instrument and that failure substantially contributes to loss, the loss is allocated between the person precluded and the person asserting the preclusion according to the extent to which the failure of each to exercise ordinary care contributed to the loss.
(c) Under Subsection (a), the burden of proving failure to exercise ordinary care is on the person asserting the preclusion. Under Subsection (b), the burden of proving failure to exercise ordinary care is on the person precluded.
A bank depositor owes to the bank the duty of exercising reasonable care to verify returned vouchers by the record kept by the depositor of the checks he has issued for the purpose of detecting forgeries or alterations. LSA-R.S. 10:4-406(c). Another statute describing the customer's duty to discover and report an unauthorized signature is LSA-R.S. 10:4-406, which states, in pertinent part:
(c) If a bank sends or makes available a statement of account or items pursuant to Subsection (a), the customer must exercise reasonable promptness in examining the statement or the items to determine whether any payment was not authorized because of an alteration of an item or because a purported signature by or on behalf of the customer was not authorized. If, based on the statement or items provided, the customer should reasonably have discovered the unauthorized payment, the customer must promptly notify the bank of the relevant facts.
(d) If the bank proves that the customer failed, with respect to an item, to comply with the duties imposed on the customer by Subsection (c), the customer is precluded from asserting against the bank:
(1) the customer's unauthorized signature or any alteration on the item, if the bank also proves that it suffered a loss by reason of the failure: and
(2) the customer's unauthorized signature or alteration by the same wrongdoer on any other item paid in good faith by the bank if the payment was made before the bank received notice from the customer of the unauthorized signature or alteration and after the customer had been afforded a reasonable period of time, not exceeding thirty days, in which to examine the item or statement of account and notify the bank.
(e) If Subsection (d) applies and the customer proves that the bank failed to exercise ordinary care in paying the item and that the failure substantially contributed to loss, the loss is allocated between the customer precluded and the bank asserting the preclusion according to the extent to which the failure of the customer to comply with Subsection (c) and the failure of the bank to exercise ordinary care contributed to the loss. If the customer proves that the bank did not pay the item in good faith, the preclusion under Subsection (d) does not apply.
"Ordinary care" for a person engaged in business is defined in LSA-R.S. 10:3-103(a)(7) as:
observance of reasonable commercial standards, prevailing in the area in which the person is located, with respect to the business in which the person is engaged. In the case of a bank that takes an instrument *64 for processing for collection or payment by automated means, reasonable commercial standards do not require the bank to examine the instrument if the failure to examine does not violate the bank's prescribed procedures and the bank's procedures do not vary unreasonably from general banking usage not disapproved by this Chapter or Chapter 4.
The extent to which the parties may modify their duties by contract is described in LSA-R.S. 10:4-103, which states, in pertinent part:
(a) The effect of the provisions of this Chapter may be varied by agreement, but the parties to the agreement cannot disclaim a bank's responsibility for its lack of good faith or failure to exercise ordinary care or limit the measure of damages for the lack or failure. However, the parties may determine by agreement the standards by which the bank's responsibility is to be measured if those standards are not manifestly unreasonable.
According to the affidavit of Higdon, the Bank made available to Ms. Peak statements of her account which reflected all charges and deposits made in connection with her account, as well as her original checks and other debit items affecting her account. The Bank mailed these items to Ms. Peak at the address she furnished to the Bank. Also, the Bank was not notified, nor was it aware of the existence, of any forged items for payment against Ms. Peak's account prior to September 20, 1994, the date the overdraft was created.
In the Bank's motion for summary judgment, the Bank introduced the deposit agreement, which clearly established the rights and obligations concerning the checking account. The deposit agreement contained provisions regarding the respective rights and duties of the parties in the event of suspected forged instruments. Specifically, it provided as follows:
"ACCOUNT STATEMENTS. You are responsible for promptly examining your statement each statement period and reporting any irregularities to us. The periodic statement will be considered correct for all purposes and we will not be liable for any payment made and charged to your Account unless you notify us in writing within certain time limits after the statement and checks are made available to you. We will not be liable for any check that is altered or any signature that is forged unless you notify us within thirty (30) calendar days after the statement and the altered or forged items(s) are made available. Also, we will not be liable for any subsequent items paid, in good faith, containing an unauthorized signature or alteration by the same wrongdoer unless you notify us within ten (10) calendar days after the statement and the first altered or forged items were made available...." (emphasis supplied.)
It is well settled under our law that parties may contract for any object which is lawful, possible, determined or determinable. LSA-C.C. art. 1971; LSA-R.S. 10:1-102(3). Once the contract has been established, it becomes the law between the parties. LSA-C.C. art. 1983.
Considering the affidavit of Higdon, it is clear that the Bank fulfilled its general obligations precisely as agreed in the deposit agreement and in accordance with statutory law.
More importantly, the Bank's evidence established negligence on the part of Ms. Peak, in that she failed to notify the Bank of the forgeries or alterations within the 30-day time period from which they were made available. Accordingly, our review of the evidence indicates the Bank carried its burden of proof with regard to proving the customer's negligence and its own ordinary care.
Once the Bank established the facts as previously set forth, it was incumbent upon Ms. Peak to come forward with depositions, affidavits, or other evidence that would indicate the forgeries were so clear that the Bank should have discovered the forgeries in a cursory examination of the checks and/or the statements were such clever alterations that Ms. Peak could not have discovered the bank statements had been altered. Unfortunately, plaintiff failed to introduce the altered statements, or any other evidence of this type.
*65 Ms. Peak's opposition to the summary judgment established the fact she did not compare her check register with her bank statement on an item-by-item basis, but rather she merely checked to see if the balances matched. Her opposition further established she gave her grandson permission to pick up her mail, which allowed him access to her bank statements. Our review of the evidence indicates Ms. Peak did not negate the fact she was negligent in untimely reporting the forged items.
Instead, Ms. Peak complains that, in addition to the Bank furnishing a monthly statement, the Bank should have been monitoring her account to the extent that any significant changes in the banking pattern should have been brought to her attention. However, plaintiff failed to introduce any evidence creating a factual issue of whether such monitoring by the Bank was within the scope of reasonable commercial standards. Because plaintiff failed to introduce such evidence, as a matter of law, there can be no allocation of loss between the parties.
Therefore, because there was no issue of material fact with regard to the conduct of the Bank and Ms. Peak, the trial court correctly rendered summary judgment.

CONCLUSION
The trial court's judgment granting the Bank's motion for summary judgment and dismissing Ms. Peak's claim is affirmed at Ms. Peak's costs.
AFFIRMED.
PARRO, J., dissents and assigns reasons.
PARRO, Judge, dissenting and assigning reasons.
It is undisputed that Ms. Peak met her initial burden of proving the existence of forged signatures on her checks. The Bank then bore the burden of proof in this case, as to whether Ms. Peak exercised reasonable care, which is a factual issue. Under LSA-R.S. 10:3-406(a) and (c), the Bank had the burden of proving Ms. Peak did not exercise ordinary care and that this failure substantially contributed to the making of the forged signatures on her checks. LSA-R.S. 10:4-406(c) states the customer's duty of ordinary care includes the exercise of reasonable promptness in examining the account statement or items to determine whether any payment was not authorized because of a forged signature. Only if the customer should reasonably have discovered the unauthorized payment on the basis of the statement and items provided, does a duty to notify the Bank arise. Again, the Bank bore the burden of proving that Ms. Peak did not examine the statements promptly or that, by examining them, she should reasonably have discovered the forgeries. LSA-R.S. 10:4-406(d).
The majority decision states that "the Bank's evidence established negligence on the part of Ms. Peak, in that she failed to notify the Bank of the forgeries or alterations within the 30-day time period from which [the statements and items] were made available." This analysis puts the cart before the horse. Under the relevant statutes, the Bank cannot assert Ms. Peak's duty to notify it until it has already proven she was not prompt or reasonable in examining her statements and that her examination should have revealed the forgeries. Failure to notify cannot establish negligence in these other particulars. Only after these other facts have been established by the Bank can it claim her notice to it was untimely. I believe genuine issues of material fact still exist concerning Ms. Peak's exercise of ordinary care under these unusual circumstances.
Additionally, under these statutes, the burden of proof does not shift back to Ms. Peak to establish the Bank's failure to exercise reasonable commercial standards until the Bank has first met its burden with respect to her negligence. LSA-R.S. 10:3-406(b) and (c); LSA-R.S. 10:4-406(d) and (e); LSA-C.C.P. 966(C)(2). I would reverse and remand for a full trial.
NOTES
[1] Judge Ralph Tyson, Nineteenth Judicial District Court, is serving as Judge Pro Tempore by special appointment of the Louisiana Supreme Court.
[2] Appellants attached the complete deposition, together with copies of cancelled checks, bank statements, etc. to the appellant's brief to this court. Only those documents filed in the trial court will be considered on this appeal. Briefs and attachments to briefs are not evidence. See Thibert v. Smith, 560 So.2d 553, 556 n. 3 (La. App. 1st Cir.1990). LSA-C.C.P. art. 2132 permits the correction of evidence which was actually introduced at trial, but it does not permit introduction of new evidence after the transcript of the appeal is filed in the appellate court. Sutton v. Montegut, 544 So.2d 1181, 1184 (La. App. 5th Cir.1989). Moreover, the court of appeal has no jurisdiction to receive new evidence. Sutton v. Montegut, 544 So.2d at 1184; Bullock v. Commercial Union Insurance Company, 397 So.2d 13, 15 (La.App. 3rd Cir.1981).
[3] Prior to the amendment, those provisions of LSA-C.C.P. art. 966 affected by the amendment read as follows:

C. After adequate discovery or after a case is set for trial, a motion which shows that there is no genuine issue as to material fact and that the mover is entitled to judgment as a matter of law shall be granted against an adverse party who fails to make a showing sufficient to establish the existence of proof of an element to his claim, action, or defense and on which he will bear the burden of proof at trial.
E. A summary judgment may be rendered on the issue of liability alone although there is a genuine issue as to the amount of damages.
F. A summary judgment may be rendered on the issue of insurance coverage alone although there is a genuine issue as to liability or the amount of damages.
G. Notwithstanding any other provision of this Article to the contrary, the burden of proof shall remain with the mover.